1  Joseph Daneshrad., Esq., SBN 147709
2  **LAW OFFICES OF JOSEPH DANESHRAD**
   11340 W. Olympic Blvd., Suite 275
3  Los Angeles, California 90064
   Phone:  (310)447-3544
4  Fax:  (310) 447-3553
5  Email:  daneshrad@yahoo.com

6
   Attorneys for Plaintiff
7  Christopher Ford

8              **UNITED STATES DISTRICT COURT**
9       **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
                  **WESTERN DIVISION**
10

11  CHRISTOPHER FORD,              Case No.:  CV10-04224 VBF (FFMx)

12           Plaintiff,            **PLAINTIFF CHRISTOPHER**
                                   **FORD'S OPPOSITION TO**
13  vs.                            **DEFENDANT BASF CATALYSTS**
                                   **LLC'S MOTION FOR SUMMARY**
14                                 **JUDGMENT; MEMORANDUM OF**
15  ENGELHARD HANOVIA, INC.;       **POINTS AND AUTHORITIES;**
    BASF CATALYSTS LLC, and DOES 1 **DECLARATION OF CHRISTOPHER**
16  through 100, inclusive,        **FORD; DECLARATION OF SIAMAK**
                                   **ETEHAD, M.D.; EXHIBIT OF**
17           Defendant.            **EVIDENCE IN SUPPORT**
18                                 **THEREOF**

19                                 **[FILED CONCURRENTLY WITH**
20                                 **SEPARATE STATEMENT OF**
21                                 **GENUINE ISSUES]**

22
23                                 Date:       July 25, 2011
24                                 Time:       1:30 p.m.
                                   Dept.:      9
25
26                                 Hon. Valerie Baker Fairbank
27
28

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES** ..................... 1

**I.     SUMMARY OF ARGUMENT** ..................................... 1

**II.    MATERIAL FACTS** ............................................... 2

**III.   STANDARD OF REVIEW** ...................................... 4

**IV.    DISCUSSION** .................................................... 5

    A.   Issue No. 1:  Prima Facie Cases for Negligence and Product Liability ...................................... 5

        1.   Prima facie cases are established .................... 5

        2.   Ultimate facts of causation, credibility, and the toxic nature of molybdenum must be decided by a jury, and as such, the motion for summary judgment should be denied ................................................. 6

        3.   The reasonable inference is that the Engelhard paint purchased in 1999 is the same Engelhard paint that Mr. Ford used from 1976 to 1980................... 8

        4.   Mr. Ford's unretained experts have and will establish a causal connection between his exposure to molybdenum in Engelhard paint to his medical conditions ............................ 9

    B.   Issue No. 2:  Statute of Limitation .......................... 10

        1.   Under the federal notice-pleading rule, Plaintiff's complaint sufficiently pled the delayed-discovery rule........................... 10

        2.   In the event the Court finds Plaintiff has failed to properly plead, Plaintiff asks leave of court to amend the complaint ..................... 10

        3.   This action is timely, filed within the applicable statute of limitation; jury

LAW OFFICES OF JOSEPH DANESHRAD

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES OF JOSEPH DANESHRAD

determination is required for ultimate facts as to whether Plaintiff conducted reasonable investigations and whether Plaintiff is without fault for the belated discovery of the cause of his molybdenum poisoning............. 11

V.    CONCLUSION ……………………………...……… 13

**DECLARATION OF CHRISTOPHER FORD** ……………………….. 14

**DECLARATION OF SIAMAK ETEHAD, M.D.** ………………………..17

**APPENDIX OF EVIDENCE** ……………………………………… 29

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

1

**TABLE OF AUTHORITIES**

2    **Cases**

3    *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)............................ 5

4    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..................... 4, 5, 12

5    *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................. 10

6    *Bihun v. AT&T Information Systems, Inc.*,
7    13 Cal. App. 4th 976, 994 (1993) ...................................................... 8

8    *Celotex Corp. v Catrett*, 477 U.S. 317 (1986) ..................................... 4

9    *Durham Management Associates*,
10    847 F. 2d 1505, 1509-1510 (11th Cir. 1988)...................................... 4

11    *Eastman Kodak Co. v. Image Technical Services, Inc.*,
     504 U.S. 451, 456 (1992) ............................................................ 6
12
13    *FSLIC v. Texas Real Estate Counselors*, Inc.,
     955 F.2d 261, 269-270 (5th Cir. 1992) .............................................. 10

14    *Fox v. Ethicon Endo-Surgery*, 35 Cal. 4th 797, 803 (2005)................. 11, 12

15    *Hanna v. Plumer*, 380 U.S. 460, 466-67 (1965)................................... 5

16    *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999)........................... 6

17    *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1109 (1988)....................... 11, 12

18    *Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996).................... 5

19    *National Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*,
20    182 F.3d 157, 160 (2nd Cir. 1999) ................................................... 4

21    *Paz v. Wauconda Healthcare & Rehab. Centre, LLC*,
22    464 F.3d 659, 664-665 (7th Cir. 2006)............................................. 4

23    *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 968-969 (1997)........... 5

24    *Soule v. GM Corp.*, 8 Cal. 4th 548, 560 (1994).................................... 5

25    *Triton Energy Corp. v. Square D Co.*,
26    68 F.3d 1216, 1222 (9th cir. 1995)................................................. 6

27    *United States v. One Tintoretto Painting*,
28    691 F. 2d 603, 606 (2nd Cir. 1982)................................................. 4

LAW OFFICES OF JOSEPH DANESHRAD

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Wang Laboratories, Inc. v Mitsubishi Electronics, America, Inc.,*
860 F. Supp. 1448, 1450 (C.D. Cal. 1993)...........................................5

*Westfall v. Erwin*, 484 U.S. 292 (1988)............................................. 6

## Statutes

*Fed. R. Civ. P.* Rule 8(e) .................................................... 10

*Fed. R. Civ. P.* Rule 56(c).................................................... 4

*Fed. R. Civ. P.* Rule 56(a), (b) ............................................. 5

*Cal. C. Civ. P.* § 335.1 .................................................... 11

*Cal. Evid. C.* § 412 ....................................................... 9

*Cal. Evid. C.* § 413 ....................................................... 8

LAW OFFICES OF JOSEPH DANESHRAD

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

# MEMORANDUM OF POINTS AND AUTHORITIES

## I

## SUMMARY OF ARGUMENTS

Defendant BASF Catalysts, LLC ("Defendant BASF"), as successor of interest to Engelhard Hanovia, Inc., designed and manufactured Engelhard paint for commercial use, and as such, Defendant BASF had a duty to Plaintiff Christopher Ford ("Mr. Ford" or "Plaintiff"), its intended user, to make a safe product. Mr. Ford suffered molybdenum toxicity after using Engelhard paint for its intended use, i.e. to paint, and as such, Defendant BASF breached its duty by making a toxic product. Engelhard paint caused Mr. Ford's molybdenum toxicity, which in turn caused his medical conditions, including recurrent kidney stones, fibromyalgia, chronic fatigue, depression, anxiety neurosis, forgetfulness, and frontal cortical degeneration.

There are genuine issues in dispute regarding **ultimate facts** of causation, credibility, and the toxic nature of molybdenum that require jury determination. Contrary to the moving party, molybdenum is a dangerous, toxic ingredient, and Mr. Ford had and has elevated levels of molybdenum in his body. Mr. Ford's symptoms evidence molybdenum toxicity. Mr. Ford's exposure from 1976 to 1980 to molybdenum in Engelhard paint caused his medical problems.

The reasonable inference is that the Engelhard paint purchased in 1999 is the same as the Engelhard paint Mr. Ford used at Sci-Tech from 1976 to 1980. Mr. Ford's unretained experts have and will establish a causal connection between his exposure to molybdenum in Engelhard paint to his medical conditions.

Under federal court's notice pleading rule, the Complaint sufficiently pled the delayed-discovery rule for it to put defendants on notice that the exposure was in 1976 and that discovery of the cause of the exposure was in 2010. In the event the Court finds that Plaintiff has not properly pled that a reasonable investigation at that

LAW OFFICES OF JOSEPH DANESHRAD

1 | time would not have revealed a factual basis for this particular cause of action,
2 | Plaintiff asks leave of court to amend the Complaint.

3 |      This action was timely filed within the two-year statute of limitation after
4 | discovery because in 2009, Mr. Ford purchased the Engelhard paint and this action
5 | was filed on April 2, 2010.  Mr. Ford is without fault for the belated discovery of the
6 | cause of his injuries, rather molybdenum is at fault.  The reasonableness of the time
7 | of Mr. Ford's suspicion of the Engelhard paint as the source of his injury is clearly a
8 | question of fact to be decided by the jury, especially in light of the fact that Mr.
9 | Ford's brain was severely damaged by the paint.

10 |
11 | **II**
12 | **MATERIAL FACTS**
13 |      This action arises out of molybdenum poisoning that has compromised
14 | Plaintiff Christopher Ford's ("Mr. Ford") body and mind.  Defendant BASF
15 | Catalysts LLC's Engelhard Hanovia paint ("Engelhard paint") at issue contains
16 | molybdenum and other precious metal.  Mr. Ford breathed in the aerosolized
17 | molybdenum in Engelhard paint or its fume when he was employed from 1976 to
18 | 1980 at Sci-Tech Glassblowing Company ("Sci-Tech").  Mr. Ford worked in the
19 | paint-room at Sci-Tech painting decorative glass for about half-a-day every day.  In
20 | the paint-room, Mr. Ford used only Engelhard Hanovia paint, and no other.
21 |      Around Thanksgiving, in November 1999, Mr. Ford suffered a battery of
22 | symptoms of molybdenum poisoning.  The symptoms included nausea, vomiting,
23 | diarrhea, chronic fatigue, insomnia, hallucinations, and sensitivity to smell and
24 | sound.  Due to the molybdenum toxicity, Mr. Ford also began experiencing
25 | symptoms related to fibromyalgia and forgetfulness, his migraine headaches from
26 | which he used to suffer as a youth worsened, and he started experiencing recurrent
27 | kidney stones.  Mr. Ford developed joint pain and tendinitis throughout his body.  A
28 | CAT scan of Mr. Ford's brain showed frontal cortical atrophy/degeneration, and as

LAW OFFICES OF JOSEPH DANESHRAD

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1  such, Mr. Ford has been diagnosed with memory loss.  Mr. Ford has been
2  determined to be permanently medically disabled since 2000.
3       Around 2000 or 2002, Mr. Ford suspected that he might be experiencing the
4  symptoms of mercury poisoning and sought and received treatment from two
5  toxicologists, Dr. Ordog and Dr. Wasserberger, who diagnosed him with
6  molybdenum toxicity.  Around 2000 or 2002, Mr. Ford received his first laboratory
7  test result from the Mayo Clinic, which showed high levels molybdenum were
8  present in his body.
9       Around 2003, Mr. Ford expanded his investigation into the causes of his
10 molybdenum poisoning by looking back at his employment history and old hobbies.
11 Mr. Ford investigated the oils he used to lubricate the lathes at work, but around
12 2004 or 2005, laboratory test results showed that none of the oils contained heavy
13 metal, including molybdenum.
14      Likewise, Mr. Ford's investigation into other products hit dead-ends.  Mr.
15 Ford and his doctors ruled out numerous causes of the molybdenum poisoning,
16 including the following:  lubricants and other products used as a scientific
17 glassblower; a flu shot; mold in Mr. Ford's home; exposure to glassblowing ovens;
18 exposure to torch tips used in glassblowing; acrylic paint; and ceramics.
19      Mr. Ford's investigation continued to hit dead-ends, until around 2009 when
20 he remembered that Sci-Tech used Engelhard paint because it contained precious
21 metals which color glass.  Mr. Ford purchased a bottle of Engelhard paint in 2009,
22 which smells, looks, and performs the same as the Engelhard paint that Mr. Ford
23 used while at Sci-Tech.  Moreover, the Engelhard paint purchased in 2009 is
24 manufactured by the same company as the one Mr. Ford used while at Sci-Tech.
25 On May 12, 2009, Mr. Ford's doctor had the sample tested at a laboratory, which
26 showed a high level of molybdenum in the paint.  Mr. Ford's doctor informed him of
27 the laboratory test results in February 2010.
28

3

LAW OFFICES OF JOSEPH DANESHRAD

### III

### STANDARD OF REVIEW

The standard applicable to summary judgment motions generally is that the court must find there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* Rule 56(c). Rule 56 must be construed "with due regard . . . for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury. . . ." *Celotex Corp. v Catrett*, 477 U.S. 317 (1986). "Neither do we suggest that the trial courts should act other than with caution in granting summary judgment. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). Because summary judgment is a "drastic device," cutting off a party's right to present its case to a jury, the moving party bears a "heavy burden" of demonstrating the absence of any triable issue of material fact. *National Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2nd Cir. 1999).

Where an issue is a mixed question of law and fact, and there is a genuine dispute as to the historical facts, summary judgment is inappropriate. *Durham Management Associates*, 847 F. 2d 1505, 1509-1510 (11th Cir. 1988). Rule 56 does not permit trial by affidavits, i.e. the court's function on a motion for summary judgment is issue-finding, not issue-resolution. *United States v. One Tintoretto Painting*, 691 F. 2d 603, 606 (2nd Cir. 1982). "The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255 (1986).

It is immaterial at the summary judgment stage that the opposing evidence is self-serving because "a plaintiff may defeat summary judgment with his or her own deposition." *Paz v. Wauconda Healthcare & Rehab. Centre, LLC*, 464 F.3d 659, 664-665 (7th Cir. 2006). "The evidence of the non-movant is to be believed, and all

1  justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*,

2  477 U.S. 242, 255 (1986).  Even where the basic facts are undisputed, if reasonable

3  minds could differ on the inferences to be drawn from those facts, summary

4  judgment should be denied.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

5        Essentially the same standard applies to partial summary judgment motions,

6  i.e. upon a showing there is no genuine issue of material fact as to particular claims

7  or defenses, the court may grant summary judgment in the party's favor "upon all or

8  any part thereof." *Fed. R. Civ. P.* Rule 56(a), (b); *see Wang Laboratories, Inc. v*

9  *Mitsubishi Electronics, America, Inc.*, 860 F. Supp. 1448, 1450 (C.D. Cal. 1993).

10        In diversity actions, as in this case, federal courts apply state substantive law

11  and federal procedural law.  *Hanna v. Plumer*, 380 U.S. 460, 466-67 (1965).

**IV**

**DISCUSSION**

**A.**   **Issue No. 1:  Prima Facie Cases for Product Liability and Negligence**

**1.**      **Prima facie cases are established.**

       The elements of strict product liability are:  "A manufacturer, distributor, or

retailer is liable in tort if a defect in the manufacture or design of its product causes

injury while the product is being used in a reasonably foreseeable way." *Soule v.*

*GM Corp.*, 8 Cal. 4th 548, 560 (1994).  The elements for negligence are:  (1) the

defendant had a legal duty to conform to a standard of conduct to protect the

plaintiff, (2) the defendant failed to meet this standard of conduct, (3) the

defendant's failure was the proximate cause of the resulting injury, and (4) the

plaintiff was damaged.  *Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996).

"California has definitely adopted the substantial factor test" for determining

causation.  *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 968-969 (1997).

LAW OFFICES OF JOSEPH DANESHRAD

LAW OFFICES OF JOSEPH DANESHRAD

1      Defendant BASF Catalysts, LLC ("Defendant BASF"), as successor of

2  interest to Engelhard Hanovia, Inc., designed and manufactured Engelhard paint for

3  commercial use, and as such, Defendant BASF had a duty to Plaintiff Christopher

4  Ford ("Mr. Ford" or "Plaintiff"), its intended user, to make a safe product.  Mr. Ford

5  suffered molybdenum toxicity after using Engelhard paint for its intended use, i.e. to

6  paint, and as such, Defendant BASF breached its duty by making a toxic product.

7  Engelhard paint caused Mr. Ford's molybdenum toxicity, which in turn caused his

8  medical conditions, including recurrent kidney stones, fibromyalgia, chronic fatigue,

9  depression, anxiety neurosis, forgetfulness, and frontal cortical degeneration.  *See*

10  Etehad Declaration ¶ 15.  As such, prima facie cases for strict product liability and

11  negligence are established.

12

13      **2.**        **Ultimate facts of causation, credibility, and the toxic nature of**

14                    **molybdenum must be decided by a jury, and as such, this motion**

15                    **for summary judgment should be denied.**

16      It is well established that summary judgment in tort cases is rare because

17  issues of "negligence," "due care" and "proximate causation" usually require jury

18  resolution of competing inferences.  *Westfall v. Erwin*, 484 U.S. 292 (1988). It is

19  also clear that inferences drawn from the evidence must be viewed in the light most

20  favorable to the nonmoving party.  *Eastman Kodak Co. v. Image Technical Services,*

21  *Inc.*, 504 U.S. 451, 456 (1992).  Expert opinion may defeat summary judgment if it

22  appears the expert is competent to give an opinion and the factual basis for the

23  opinion is disclosed.  *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1222

24  (9th cir. 1995).  And, issues of credibility are ultimate facts for a jury to determine,

25  and therefore cannot be resolved on summary judgment.  *Harris v. Itzhaki*, 183 F.3d

26  1043, 1051 (9th Cir. 1999).

27

28

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1    Here, the motion for summary judgment should be denied because there are

2  genuine issues in dispute regarding **ultimate facts** of causation, credibility, and the

3  toxic nature of molybdenum that require jury determination.

4    Controverting Defendant BASF's moving papers, Plaintiff's research has

5  established that too little or too much molybdenum will harm health.  *See* Etehad

6  Declaration, ¶ 9(a).  Too much molybdenum causes, among other things, death;

7  cartilage and bone degeneration; damage to brain, kidney, lungs, and liver; arthritis;

8  infertility; and testicular degeneration.  *See* Etehad Declaration, ¶ 10(a)-(h).

9  Molybdenum being a toxin is established and is part of a family of metals that cause

10  madness.  *See* Etehad Declaration, ¶ 9(c)-(d).  Ford's urinalysis tests results showed

11  he had elevated levels of molybdenum in his body.  *See* Etehad Declaration, ¶ 15(d).

12  As such, whether the molybdenum in Engelhard paint is a dangerous, toxic

13  ingredient and whether Mr. Ford had and has elevated levels of molybdenum in his

14  body are ultimate facts to be decided by a jury.

15    Controverting Defendant BASF's moving papers, the onset of symptoms of

16  molybdenum includes diarrhea, hallucination, and insomnia, all of which Mr. Ford

17  experienced in 1999 when his battery of symptoms of molybdenum poisoning

18  occurred.  *See* Etehad Declaration, ¶¶ 11(a), 12(c), 14(d).  A reported case of

19  molybdenum toxicity in a human showed frontal cortical damage of the brain due to

20  the molybdenum poisoning, which is consistent and highly relevant with Mr. Ford's

21  CAT scan of his brain showing frontal cortical atrophy.  *See* Etehad Declaration, ¶¶

22  11(b), 14(e).  Molybdenum toxicity causes inter alia cartilage and bone

23  degeneration; damage to brain, liver, lungs; and arthritis, all of which are consistent

24  with Mr. Ford's symptoms of fibromyalgia, chronic fatigue, migraines,

25  forgetfulness, and frontal cortical atrophy.  *See* Etehad Declaration, ¶¶ 10, 14.  As

26  such, whether Mr. Ford's symptoms evidence molybdenum toxicity is an ultimate

27  fact to be decided by a jury.

28

LAW OFFICES OF JOSEPH DANESHRAD

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

LAW OFFICES OF JOSEPH DANESHRAD

Controverting Defendant BASF's moving papers, molybdenum is not fully excised from the body, rather it accumulates in the body in the brain, testes, endocrine glands, fat tissue, teeth, and bone. *See* Etehad Declaration, ¶ 13(b). Defendant BASF argues both that molybdenum is essential for health and that it is fully excised from the body within weeks. Were it fully excised from the body, one would expect widespread health problems, which is not the case. In Mr. Ford's case, he was over-exposed to molybdenum when he used Engelhard paint from 1976 to 1980 while working for Sci-Tech, which accumulated in his body reaching a level of toxicity that caused the onset of battery of symptoms of molybdenum poisoning in 1999. *See* Etehad Declaration, ¶ 15. As such, a jury ought to decide the credibility of the dueling experts and the ultimate fact of whether Mr. Ford's exposure from 1976 to 1980 to molybdenum in Engelhard paint caused his medical problems.

3. **The reasonable inference is that the Engelhard paint purchased in 1999 is the same Engelhard paint that Mr. Ford used from 1976 to 1980.**

The Engelhard paint purchased in 2009 by Mr. Ford smells, looks, and performs the same as the Engelhard paint used at Sci-Tech. *See* Ford Declaration, ¶ 15. It is made by the same company as the Engelhard paint used at Sci-Tech. *See* Ford Declaration, ¶ 15. Thus, the reasonable inference is that the Engelhard paint purchased in 1999 is the same as the Engelhard paint Mr. Ford used at Sci-Tech from 1976 to 1980.

"In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny . . . his willful suppression of evidence. . . ." *Cal. Evid. C. §* 413. A trier of fact may infer that the evidence suppressed would have been unfavorable to that party. *See Bihun v. AT&T Information Systems, Inc.*, 13 Cal. App. 4th 976, 994 (1993).

1    Discovery has been completed in this case, and Defendant BASF has not

2  produced any evidence to suggest that there has been any reformulation of

3  Engelhard paint.  Defendant BASF did not disclose the paint formulation or any

4  reformulation in its initial disclosure or anytime thereafter.  Only Defendant BASF

5  has access to such information.  However, it appears that Defendant BASF is hiding

6  the ball and then turning around and blaming Plaintiff for not having the

7  information.

8      "If weaker and less satisfactory evidence is offered when it was within the

9  power of the party to produce stronger and more satisfactory evidence, the evidence

10  offered shall be viewed with distrust."  *Cal. Evid. C.* § 412.

11    In its moving papers, Defendant BASF has not submitted any evidence in

12  support of its claim that the formulation of the Engelhard paint has changed since

13  1976.  Defendant BASF is merely speculating as to the information that only it has

14  access to.  The combination of Defendant BASF's reformulation claim being suspect

15  and inferences favoring the non-moving party, the reasonable inference here is that

16  the Engelhard paint purchased in 2009 is the same as the one Mr. Ford was exposed

17  to while working at Sci-Tech.

18

19     **4.    Mr. Ford's unretained experts have and will establish a causal**
20          **connection between his exposure to molybdenum in Engelhard**
          **paint to his medical conditions.**

21

22    Mr. Ford's unretained experts have and will establish a causal connection

23  between his exposure to molybdenum in Engelhard paint to his medical conditions.

24  In fact, Dr. Etehad and Dr. Wasserberger, unretained experts, have already

25  established the causal connection and will testify to the same.  *See* Etehad

26  Declaration ¶ 15; Dr. Wasserberger medical reports attached as Ex. I, M, & N to

27  Hernandez Declaration.

28

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

LAW OFFICES OF JOSEPH DANESHRAD

**B.   Issue No. 2:  Statute of Limitation**

      **1.   Under the federal notice-pleading rule, Plaintiff's complaint sufficiently pled the delayed-discovery rule.**

The Federal Rules of Civil Procedure govern the sufficiency of a pleading, even those based on diversity jurisdiction. *FSLIC v. Texas Real Estate Counselors, Inc.*, 955 F.2d 261, 269-270 (5th Cir. 1992).  Federal courts employ notice pleading in that a complaint is sufficient if it gives the defendant "fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Pleadings are liberally construed because they "must be construed so as to do justice. *Fed. R. Civ. P.* Rule 8(e).

Here, Plaintiff pled that he was exposed to molybdenum in Engelhard paint from 1976 to 1980, which caused his molybdenum toxicity, and that around February 2010, he discovered that Engelhard paint was the cause of his molybdenum toxicity. *See* Complaint attached as Ex. A to Hernandez Declaration in the Moving Papers.  As such, the Complaint sufficiently pled the delayed-discovery rule for it put defendants on notice that the exposure was in 1976 and that discovery of the cause of the exposure was in 2010.

      **2.   In the event the Court finds Plaintiff has failed to properly plead, Plaintiff asks leave of court to amend the complaint**

In the event the Court finds that Plaintiff has not properly pled that a reasonable investigation at that time would not have revealed a factual basis for this particular cause of action, Plaintiff asks leave of court to amend the Complaint.

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

LAW OFFICES OF JOSEPH DANESHRAD

**3.      This action is timely, filed within the applicable statute of limitation; jury determination is required for ultimate facts as to whether Plaintiff conducted reasonable investigations and whether Plaintiff is without fault for the belated discovery of the cause of his molybdenum poisoning.**

California statute of limitations for actions based on exposure to toxic substance, other than asbestos, is as follows:

> [T]he time for commencement of the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later. *Cal. C. Civ. P.* § 335.1.

The "delayed-discovery rule" provides that the accrual date of a cause of action is delayed until the plaintiff is aware of his injury and its negligent cause, "unless the plaintiff pleads and proves that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action." *Fox v. Ethicon Endo-Surgery*, 35 Cal. 4th 797, 803 (2005); *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1109 (1988).

After the onset of symptoms in 1999, Mr. Ford diligently investigated every conceivable product that he worked or played with that might have caused his molybdenum poisoning and discovered none of them contained molybdenum except for Engelhard paint, which contains high levels of molybdenum. *See* Ford Declaration, ¶¶ 10-16. His expansive but fruitless investigation into the possible cause of his molybdenum poisoning included the following:  the oils he used to lubricate the lathes at work, lubricants and other products used as a scientific glassblower, a flue shot, mold in his home, exposure to glassblowing ovens, exposure to torch tips used in glassblowing, and ceramic. *See* Ford Declaration, ¶¶ 12, 13. However, contrary to the baseless statement in Defendant BASF's moving

11

1 | papers, Mr. Ford did **not** suspect or investigate any paint other than the Engelhard

2 | paint in 2009 as a possible cause of the molybdenum toxicity.

3 |      In 2009, Mr. Ford purchased the same paint he had used at Sci-Tech from

4 | 1976 to 1980. *See* Ford Declaration, ¶ 17. Mr. Ford then discovered that the paint

5 | had high levels of molybdenum in February 2010 when his doctor informed him of

6 | that fact. This action was filed on April 2, 2010. As such, this action was timely

7 | filed within the two-year statute of limitation after discovery.

8 |      The issue of belated discovery of the cause of action is ordinarily a **question**

9 | **of fact**, and only if it is objectively clear that only one conclusion can be drawn, the

10 | decision may be made as a matter of law. *Jolly v. Eli*, 44 Cal. 3d 1103, 1112 (1988).

11 | Plaintiff must show he was not at fault for the belated discovery of the cause of

12 | action. *Fox v. Ethicon*, 35 Cal. 4th 797, 808-09 (2005). "The judge's function is not

13 | himself to weigh the evidence and determine the truth of the matter but to determine

14 | whether there is a genuine issue for trial . . . Credibility determinations, the

15 | weighing of the evidence, and the drawing of legitimate inferences from the facts

16 | are jury functions. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-255

17 | (1986).

18 |      Here, Mr. Ford is without fault for the belated discovery of the cause of his

19 | injuries. Mr. Ford did not suspect Engelhard paint as the cause of his injuries until

20 | 2009. Defendant BASF claims that it was unreasonable for Mr. Ford not to suspect

21 | the source of the injuries sooner. The reasonableness of the time of Mr. Ford's

22 | suspicion of the Engelhard paint as the source of his injury is clearly a question of

23 | fact to be decided by the jury, especially in light of the fact that Mr. Ford's brain was

24 | severely damaged by the paint.

25

26

27

28

LAW OFFICES OF JOSEPH DANESHRAD

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

# V

## CONCLUSION

Based on the foregoing arguments and authorities, it is respectfully submitted that Defendant BASF Catalysts LLC's motion for summary judgment or in the alternative for summary adjudication of claims should be denied in its entirety.

DATED: July 1, 2011          **LAW OFFICE OF JOSEPH DANESHRAD**


By:_____

JOSEPH DANESHRAD
Attorneys for Plaintiff
CHRISTOPHER FORD

LAW OFFICES OF JOSEPH DANESHRAD

13

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

## DECLARATION OF CHRISTOPHER FORD

I, CHRISTOPHER FORD, declare:

1.     I am a party to this action as the plaintiff.  I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness, I could and would competently testify thereto in a court of law.

2.     Molybdenum poisoning has compromised my body and mind.

3.     Defendant BASF Catalysts LLC's Engelhard Hanovia paint ("Engelhard paint") at issue in this lawsuit contains molybdenum and other precious metal.

4.     I breathed in the aerosolized molybdenum in Engelhard paint or its fume when I was employed from 1976 to 1980 at Sci-Tech Glassblowing Company ("Sci-Tech").

5.     I worked in the paint-room at Sci-Tech painting decorative glass for about half-a-day every day.  In the paint-room, I used only Engelhard Hanovia paint, and no other.

6.     Around Thanksgiving, in November 1999, I suffered a battery of symptoms of molybdenum poisoning.  The symptoms included nausea, vomiting, diarrhea, chronic fatigue, insomnia, hallucinations, and sensitivity to smell and sound.

7.     Due to the molybdenum toxicity, I also began experiencing symptoms related to fibromyalgia and forgetfulness, my migraine headaches from which I used to suffer as a youth worsened, and I started experiencing recurrent kidney stones.  I developed joint pain and tendinitis throughout his body.  A CAT scan of my brain showed frontal cortical atrophy/degeneration, and as such, I has been diagnosed with memory loss.

8.     I have been determined to be permanently medically disabled since 2000.

LAW OFFICES OF JOSEPH DANESHRAD

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

9.     Around 2000 or 2002, I suspected that I might be experiencing the symptoms of mercury poisoning and sought and received treatment from two toxicologists, Dr. Ordog and Dr. Wasserberger, who diagnosed me with molybdenum toxicity.

10.     Around 2000 or 2002, I received my first laboratory test result from the Mayo Clinic, which showed high levels molybdenum were present in my body.

11.     Around 2003, I expanded my investigation into the causes of my molybdenum poisoning by looking back at my employment history and old hobbies.

12.     I investigated the oils I used to lubricate the lathes at work, but around 2004 or 2005, laboratory test results showed that none of the oils contained heavy metal, including molybdenum.

13.     Likewise, my investigation into other products hit dead-ends. My doctors and I ruled out numerous causes of the molybdenum poisoning, including the following: lubricants and other products used as a scientific glassblower; a flu shot; mold in my home; exposure to glassblowing ovens; exposure to torch tips used in glassblowing; and ceramics.

14.     My investigation continued to hit dead-ends, until around 2009 when I remembered that Sci-Tech used Engelhard paint because it contained precious metals which color glass. I purchased a bottle of Engelhard paint through the internet from a seller in New Mexico.

15.     The Engelhard paint that I purchased in 2009 is the same as the paint I used at Sci-Tech from 1976 to 1980. It smells, looks, and performs the same as the Engelhard paint I used while working at Sci-Tech. It is also made by the same company as the Engelhard paint I used at Sci-Tech.

16.     On May 12, 2009, my doctor had the sample tested at a laboratory, and the test results showed a high level of molybdenum in the paint. My doctor informed me of the laboratory test results in February 2010. As such, I did not discover the cause of my molybdenum poisoning until February 2010.

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

LAW OFFICES OF JOSEPH DANESHRAD

17.     From Thanksgiving of 1999 (when I suffered a battery of symptoms of molybdenum poisoning) to February 2010 (when my doctor informed me of the laboratory test results for Engelhard paint), I have diligently investigated what might have caused my molybdenum poisoning.  Despite my said reasonable investigation at that time, the cause of my molybdenum poisoning did not and would not reveal itself.

I declare under penalty of perjury under the laws of the State of California that the foregoing in true and correct and that this declaration was executed on June 30, 2011 at Los Angeles, California.

*Christopher Ford*
Christopher Ford

LAW OFFICES OF JOSEPH DANESHRAD

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

**DECLARATION OF SIAMAK ETEHAD, M.D.**

I, SIAMAK ETEHAD, M.D., declare:

1.      I am a medical doctor licensed to practice in the state of California.  I am aware of the matters stated in this declaration, and if called upon as a witness, I could and would competently testify thereto in a court of law.

2.      I am a board certified internal medicine clinician since 1988.  I have been practicing medicine in Southern California since 1988.  I am currently practicing Internal Medicine in Northridge, California.

3.      I am also board eligible in emergency medicine and physical medicine and rehabilitation.  I am a consultant for Granada Providence Holy Cross Medical Center, Mission Community Hospital, Pacific Hospital of the valley.

4.      I have extensive experience, expertise, and knowledge with the diagnosis and treatment of metal poisoning, mold toxicity, chemical poisoning, pesticide exposure, and polysubstance abuse.

5.      Christopher Ford (Mr. Ford) is a patient of mine, and I have examined and conducted diagnostic tests on Mr. Ford.

6.      I have reviewed the medical records of Mr. Ford, including the following:

      a.      Medical records from Dr. John r. Dietz regarding Mr. Ford's migraines.

      b.      Medical records from Dr. Gary Ordog regarding Mr. Ford's molybdenum poisoning;

      c.      Medical records from Dr. Wasserberg regarding Mr. Ford's molybdenum poisoning;

      d.      Radiological reports regarding Mr. Ford's frontal cortical atrophy/degeneration.

      e.      Laboratory results from 2002 to 2010.

7.      I have conducted research on molybdenum and its effects as listed on paragraph Sixteen (16) herein below.

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

LAW OFFICES OF JOSEPH DANESHRAD

8.  I have reviewed the Declarations of John Whysner, M.D., Ph.D, D.A.B.T. and Stephen T. Washburn.

9.  My research on molybdenum and its effects show the beneficial and detrimental effects of molybdenum exposure are as follows:

    a.  Molybdenum metal exposure is not completely benign to health, rather it is harmful to human health when above certain levels.  "[M]etals, such as . . . molybdenum . . . are essential for good health but may be harmful above certain levels."  *See* Meeker et al. (2011); Meeker et al. (2008); Institute of Medicine (2001).

    b.  Molybdenum affects the body if inhaled, swallowed, or contacts the eyes.  *See* U.S. Dept. of Labor (1978).

    c.  It is well established that molybdenum toxicity exists.  "The toxic role of molybdenum has been demonstrated. . . ."  *See* Arrington & Davis (1953).

    d.  Molybdenum may cause madness.  As expounded by one author: "Heavy metal damage to the brain is well documented for mercury, manganese, lead, and cadmium.  Even the term *Lucor manganicum* (manganese madness) has been coined. . . [M]olybdenum is a new and unwelcome member of the *Lucor metallicum* family.  (Emphsis in original).  *See* Momčilovič (1999).

10.  My research on molybdenum and its effects show that molybdenum poisoning causes or is correlated with myriad of medical problems, including the following:

    a.  Molybdenum toxicity causes premature **deaths**.  *See* Schroeder and Mitchener (1971).  "[T]here were some deaths," when guinea pigs were exposed to fume from molybdenum.  *See* U.S. Dept. of Labor (1978).  Molybdenum toxicity symptoms include death.  *See* Arrington and David (1953).

    b.  Molybdenum poisoning causes **brain damage**.  When molybdenum is deposited in the grey matter of the brain, it will inhibit the nerve transport,

LAW OFFICES OF JOSEPH DANESHRAD

LAW OFFICES OF JOSEPH DANESHRAD

1    increase the breakdown of various neurotransmitters, and stimulate the

2    production of harmful protein. *See* Lener and Bibr (1984).  Molybdenum

3    deposits can cause "seizures, decreased learning ability, impaired motor

4    coordination, memory loss, and even psychotic reactions." *See* Momčilović

5    (1999).  Molybdenum is associated with ataxia [gross lack of coordination]

6    due to it causing cortical degeneration and demyelination [neural

7    degeneration] of the cortex and spinal cord. *See* Mills & Fell (1960).

8    Accumulation of molybdenum has been associated with manic-depression.

9    *See* Naylor et al. (1985).

10   c.   Molybdenum poisoning causes **cartilage and bone degeneration**.

11   Molybdenum poisoning causes cartilaginous and bone erosions and

12   lameness. *See* Thomas and Moss (1951).  Molybdenum causes skeletal

13   changes. *See* Miller et al. (1956).

14   d.   Molybdenum poisoning causes **kidney damage**.  Fume from molybdenum

15   metal "causes kidney damage." *See* U.S. Dept. of Labor (1978).

16   e.   Molybdenum poisoning causes **damages to the lungs**.  Fume from

17   molybdenum "causes respiratory irritation," which "might cause

18   exacerbation of symptoms" in "persons with impaired pulmonary function."

19   *See* U.S. Dept. of Labor (1978).  Inhalation of 4 mg of molybdenum per

20   cubic meter for 4 years "was associated with pseumoconiosis [lung

21   disease]." *See* Casarett and Doull (1975); Vyskocil and Viau (1999).

22   f.   Molybdenum poisoning causes **liver damage**.  Fume from molybdenum

23   "causes liver damage." *See* U.S. Dept. of Labor (1978).

24   g.   Accumulation of molybdenum contributes to **arthritis**. *See* Hosokawa and

25   Yoshida (1994).

26   h.   Molybdenum causes **infertility and testicular degeneration**. *See*

27   Schroeder and Mitchener (1971). Chronic molybdenum exposure causes

28   testicular atrophy and degeneration. *See* Lesser and Weiss (1995); Thomas

19

LAW OFFICES OF JOSEPH DANESHRAD

and Moss (1951).  Molybdenum causes male infertility and testicular degeneration.  *See* Jeter and David (1953).  High levels of molybdenum is associated with low semen quality.  *See* Meeker et al. (2008).  Molybdenum is "associated with reduced testosterone." (Meeker et al. (2010).  Molybdenum is associated with degeneration of sperm production.  *See* Thomas and Moss (1951).

    i.   "High dietary intake of molybdenum has been reported to be associated with a gout-like disease and high blood uric acid." *See* U.S. Dept. of Labor (1978).

11.    In my research on molybdenum and its effects, the following case study of a battery of symptoms of molybdenum poisoning involving a young man living in California is similar and therefore highly relevant to Mr. Ford's battery of symptoms of molybdenum toxicity and his corresponding medical problems.

    a.   A man in his late thirties, living in California, U.S.A., was arrested and taken to an emergency room after he ingested high doses of molybdenum supplements and experienced "acute psychosis with visual and auditory hallucinations, a series of *petit mal* seizures, and one life threatening *grand mal* attack." (Emphasis in original).  *See* Momčilović (1999).  "[H]e had . . . insomnia . . . and painful and cold extremities." *See* Momčilović (1999).

    b.   "A battery of neuropsychological tests and Spectral Emission Computer Tomography demonstrated evident frontal cortical damage of the brain." *See* Momčilović (1999).  At the emergency room, "[t]here was no signs of skull fracture or haemorrhage on nuclear magnetic resonance image.  Yet, the patient was mentally incapable of answering the most basic questions and some of this answers proved to be false on later examination." *See* Momčilović (1999).

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

c.    "One year after the Mo [molybdenum] poisoning, the patient was diagnosed toxic encephalopathy with executive deficiencies, learning disability, major depression, and post-traumatic stress disorder." *See* Momčilović (1999).

d.    The author of this case study "strongly advocates issuance of and strict adherence to written warnings on the instruction labels not to mix potentially harmful neurotoxic substances, such as molybdenum, with other nutriceuticals and to instructions stating maximal single and cumulative doses. Molybdenum is a new and unwelcome member of the 'metal madness' family." *See* Momčilović (1999).

12.    My research on molybdenum and its effects show that the symptoms of molybdenum poisoning include the following:

a.    Symptoms of chronic molybdenum exposure include "weakness, fatigue, . . . headache, arthralgia [joint pain], myalgia [muscle pain], chest pain." *See* Momčilović (1999).

b.    Molybdenum toxicity symptoms include "alopecia [hair loss], slight dermatosis [skin disease], anemia and death." *See* Arrington and David (1953).

c.    Signs of human molybdenum toxicity are "diarrhoea, anaemia, immaturity of erythrocytes [red blood cells]. . . ." *See* European Commission (2000).

d.    Molybdenum toxicity causes hair to turn grey or white. *See* Thomas and Moss (1951).

e.    A marked symptom of molybdenum toxicity is a lack of libido. *See* Thomas and Moss (1951).

13.    My research on molybdenum and its effects show that molybdenum exposure is constant and that molybdenum accumulates in the body, as enunciated below:

a.    **People are constantly exposed to molybdenum**. Molybdenum "is ubiquitous in food and water." *See* European Commission (2000). "Molybdenum is a ubiquitous trace element found in food and drinking

21

LAW OFFICES OF JOSEPH DANESHRAD

water, and is present in multivitamin/multimineral supplements." *See* Meeker et al. (2011). "The general population is exposed to metals at low concentrations either voluntarily through supplementation or involuntarily through intake of contaminated food and water or contact with contaminated soil, dust, or air." *See* Meeker et al. (2008).

b.   **Molybdenum accumulates in the body and therefore can never be fully excised from the body**. Ten days after intravenous administration of molybdenum to human volunteers, about 25% was excreted via urine and between 1-6% via feces, indicating that around 70% was retained and redistributed elsewhere in the body. *See* Momčilovič (1999); Lener and Bibr (1984). "Molybdenum was found to accumulate in the testes . . . and in the brain (including hypothalamus), adrenal, pituitary. . . ." *See* Meeker et al. (2011). When radio-molybdenum was injected, molybdenum accumulated in the endocrine glands and the brain. *See* Haywood et al. (1998). The brain is rich in fat tissue and molybdenum has shown preference for depositing in the fat tissue. *See* Momčilovič (1999); Sullivan and Krieger (1992). "Molybdenum in plasma appears to reflect the 'hide-and-seek' situation where molybdenum is rapidly disappearing from plasma and accumulating in the fat tissue of the brain, or elsewhere." *See* Momčilovič (1999). Bone storage of molybdenum has been noted. *See* Patty (1981). After autopsy, the "[a]dministered molybdenum has been found to be retained to the largest degree in bone." *See* Thomas and Moss (1951). Molybdenum "accumulates in teeth and dental enamel." *See* European Commission (2000).

14.   My examination of Mr. Ford and review of his medical records show the following:

a.   Starting from the early 1980's, Mr. Ford has been diagnosed and treated for recurrent kidney stones.

LAW OFFICES OF JOSEPH DANESHRAD

22

LAW OFFICES OF JOSEPH DANESHRAD

b.     Mr. Ford had been diagnosed with fibromyalgia, chronic fatigue, migraine headaches, depression, anxiety neurosis, forgetfulness, and frontal cortical atrophy/degeneration.

c.     From 1976 to 1980, Mr. Ford was a glass blower and inhaled aerosolized molybdenum and/or fume from molybdenum when he used the Engelhard Hanovia paint at high temperature to color glass in his employment as a glass blower at Sci-Tech Glassblowing Company.

d.     Around 1999, Mr. Ford began to experience a battery of symptoms, including but not limited to nausea, vomiting, diarrhea, chronic fatigue, insomnia, hallucinations, and sensitivity to sound and smell.  Mr. Ford also began experiencing symptoms related to fibromyalgia and forgetfulness. His migraine headaches from which he used to suffer as a youth worsened. Mr. Ford developed joint pain and tendinitis throughout his body.

e.     In 2000, a CAT scan of Mr. Ford's brain showed frontal cortical atrophy/degeneration.

f.     Mr. Ford's molybdenum levels as measured by urinalysis are as follows:  (1) 100 mcg/l on August 19, 2002, (2) 220 mcg/l on July 22, 2003, (3) 250 mcg/l on July 29, 2003, (4) 90 mcg/l on June 9, 2004, (5) 89 mcg/l in May 2009, and (6) 100 mcg/l in August 2010.

15.     Based upon the foregoing—my examinations of Mr. Ford, review of his medical records, the medical research on molybdenum, and my background, skills, education, training, and experience in the field of internal medicine and toxicology—the following is my opinion that within a reasonable medical probability,

a.     Engelhard-Hanovia plaint, that contained molybdenum and to which Christopher Ford was exposed to from 1976 to 1980, caused Mr. Ford to suffer molybdenum poisoning/toxicity.  This molybdenum toxicity actually and proximately caused an onset of a battery of symptoms in November 1999, wherein Mr. Ford

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

1    experienced nausea, vomiting, diarrhea, chronic fatigue, insomnia, hallucinations, and

2    sensitivity to sound and smell.

3         b.    The molybdenum toxicity caused or significantly contributed to Mr. Ford's

4    recurrent kidney stones, fibromyalgia, chronic fatigue, depression, anxiety neurosis,

5    forgetfulness, and frontal cortical degeneration.

6         c.    The molybdenum toxicity caused or significantly contributed to Mr. Ford's

7    severe and recurrent migraine headaches, which he used to suffer from in his childhood

8    and had been in remission until he experienced the battery of symptoms in November

9    1999.

10        d.    Mr. Ford's urinalysis test results show he had elevated levels of

11   molybdenum in his system.

12   16.   References:

13        a.    Arrington, L.R., Davis, G.K., "Molybdenum Toxicity in the Rabbit," J.
               Nutr., 51:295-304 (1953).

14

15        b.    Barceloux, D.G.: "Molybdenum," *Clinical Toxicology*, 37:231-237, 1999.

16        c.    Casarett, L.J. and Doull, J.:  Toxicology, Macmillan Publishing Co., New
               York (1975).

17

18        d.    Chuttani, H.K., Gupta, P.S., Gulati, S., Gupta, D.N.:  "Acute Copper Sulfate
               Poisoning," *Am. J. Med.* 39:849-854 (1965).

19

20        e.    European Commission Health & Consumer Protection Directorate-General,
               Scientific Committee on Food:  *Opinion of the Scientific Committee on*

21             *Food on the Tolerable Upper Intake Level of Molybdenum*,
               SCF/CS/NUT/UPPLEV/22 Final (2000).

22

23        f.    Fisher, D.C.:  *Copper* of *Clinical Environmental Health and Toxic
               Exposures* (2nd ed.), Chap. 75, pp. 898-902 (2001).

24

25        g.    Fungwe, T.V., Duddingh, F., Demick D.S., et al.:  The Role of Dietary
               Molybdenum on Oestrous Activity, Fertility, Reproduction and

26             Molybdenum and Copper Enzyme Activities of Female Rats," *Nutr. Res.*,
               10:515-524 (1990).

27        h.    Haywood S., Dincer Z., Holding J., Parry N.M., "Metal (molybdenum,

28             copper) Accumulation and Retention in Brain, Pituitary and other Organs of

LAW OFFICES OF JOSEPH DANESHRAD

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

LAW OFFICES OF JOSEPH DANESHRAD

1

2             Ammonium Testrathiomolybdated-Treated Sheep," *Br. J. Nutr.*, 79:329-31 (1993).

3   i.    Hosokawa, S. and Yoshida, O.: "Clinical Studies on Molybdenum in Patients Requiring Long-Term Hemodialysis," *Asaio J.*, 40(3):M445-449.

4

5   j.    Institute of Medicine: *Dietary Reference Intakes for Vitamin A, Vitamin K, Arsenic, Boron, Chromium, Copper, Iodine, Iron, Manganese, Molybdenum, Nickel, Silicon, Vanadium and Zinc: A Report of the Panel on Micronutrients*, National Academy Press, Washington, DC, pp. 729-769 (2001).

6

7

8   k.    Jeter, M.A. and Davis, G.K.: "The Effect of Dietary Molybdenum upon Growth, Hemoglobin, Reproduction and Lactation of Rats," *J. Nutr.*, 54:215-220 (1954).

9

10  l.    Lener J. and Bibr B., "Effects of Molybdenum on the Organism, *J. Jyg. Epidmiol. Microbiol. Immunol.*, 28:405-19 (1984).

11

12  m.   Lesser S.H. and Weiss S.J., *Art Hazards*, New York, NY, Saunders Co., pp. 451-8 (1995).

13

14  n.    Liu, J., Goyer Ram Waalkes, M.P.: *Molybdenum in Toxic Effect of Metals* of *Casarett and Doull's Toxicology: The Basic Science of Poisons*, Klaassen D.C., Ed. McGraw Hill, pp. 956-957 (2008).

15

16  o.    Meeker, J.D., Rossano, M.G., Protas, B., et al.: "Cadmium, Lead, and Other Metals in Relation to Semen Quality: Human Evidence for Molybdenum as a Male Reproductive Toxicant," *Env. Health Persp.*, 116:1473-1479 (2008).

17

18

19  p.    Meeker, J.D., Rossano, M.G., Protas, B., et al.: "Environmental Exposure to Metals and Male Reproductive Hormones: Circulating Testosterone is Inversely Associated with Blood Molybdenum," *Fertility and Sterility*, 93:130-140 (2010).

20

21

22  q.    Miller, R.F., Price, N.O., and Engel R.W.: "Added Dietary Inorganic Sulphate and its Effect upon Rats Fed Molybdenum," *J. Nutr.*, 60:539-547 (1956)

23

24  r.    Mills C.F. and Fell B.F.: "Demyelination in Lambs Born of Ewes Maintained on High Intakes of Sulphate and Molybdate," *Nature*, 185:20-22 (1960).

25

26  s.    Momčilovič, B.: "A Case Report of Acute Human Molybdenum Toxicity from a Dietary Molybdenum Supplement—A New Member of the 'Lucor Metallicum' Family," *Arh Hig Rada Toksikol*, 50:289-297 (1999).

27

28

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

LAW OFFICES OF JOSEPH DANESHRAD

t.   Naylor G.J., Smith, A.H.W., Bryce-Smith, d., Ward N.I., "Trace Elements in Maniac Depressive Psychosis," *J. Affect. Disord.*, 8:131-6 (1985).

u.   Paschal, D.C., Ting, B.G., Morrow, J.C., et al.: "Trace Metals in Urine in United States Residents:  Reference Range Concentrations," *Environ. Res.*, Sec. A, 76:53-59 (1998).

v.   Patty, F.A. (ed.):  *Toxicology*, Vol. II of *Industrial Hygiene and Toxicology* (2nd ed. rev.), Interscience, New York (1963).

w.   Patty, F.A.:  *?????*, Vol. ???? of *Industrial Hygiene and Toxicology* (3nd ed.), Wiley Interscience Publ., New York (1981).

x.   Schroeder, H.A. and Mitchener, M:  "Toxic Effects of Trace Elements on the Reproduction of Mice and Rats," *Arch. Environm Health*, 23:102-106 (1971).

y.   Selden, A.I., Berg, N.P., Soderbergh, A., Bergstrom, E.O.:  "Occupational Molybdenum Exposure and a Gouty Electrician," *Occupational Medicine*, 55:145-148 (2005).

z.   Smythe, W.R., Alfrey, A.C., Craswell, P.W., et al.:  "Trace Element Abnormalities in Chronic Uremia," *Ann. Int. Med.* 96:302-310 (1982).

aa.  Sullivan J.B. and Krieger, G.R., Hazardous Materials Toxicology, Baltimore, MD, Williams and Wilkins, 905-7 (1992).

bb.  Thomson, J.W. and Moss, S.:  *The Effect of Orally Administered Molybdenum on Growth, Spermatogenesis and Testes Histology of Young Dairy Bulls*, Bureau of Diary Industry, Agricultural Research Admin., U.S.D.A. (1951).

cc.  Turnlund, J.R., Keyes, W.R., Peiffer, G.L, Chiang, G.: "Molybdenum Absorption, Excretion and Retention Studies with Stable Isotopes in Young Men During Depletion and Repletion," *Am. J. Clin. Nutr.*, 61:1102-1109 (1995).

dd.  U.S. Dept. of Labor, Occupational Safety and Health Admin.: *Occupational Health Guideline for Molybdenum and Insoluble Molybdenum*, pp. 1-5 (1978).

ee.  U.S. EPA:  *Health Effects of Molybdenum in Drinking Water*, EPA-600/1-79-006 (1989).

ff.  Vyskočil, A., Viau, C.:  "Assessment of Molybdenum Toxicity in Humans," *J. Appl. Toxicol.*, 19:185-192 (1999).

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

gg.   Walravens, P.A., Moure-Eraso, R., Solomons, C.C., et al.: "Biochemical Abnormalities in Workers Exposed to Molybdenum Dust," *Arch. Env. Health*, Sept/Oct:302-308 (1979).

hh.   Ward, G.M.: "Molybdenum Toxicity and Hypocuprosis in Ruminants: A Review," *J. Anim. Sci.*, 46:1078-1085 (1978).

ii.   World Health Organization: *Trace Elements and Human Health*, World Health Organization, Geneva, pp. 144-152 (1996).

jj.   Yoon, S., Han, S.S., Rana S.V.S.: "Molecular Markers of Heavy Metal Toxicity—A New Paradigm for Health Risk Assessment," *J. Env. Biology*, 29:1-14 (2008).

LAW OFFICES OF JOSEPH DANESHRAD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

1        I declare under penalty of perjury under the laws of the State of California that the

2  foregoing in true and correct and that this declaration was executed on <u>June 28, 2011</u> at Los

3  Angeles, California.

4

5

6

7                                   _Sf Etn, m_

                                  Siamak Etehad, M.D.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LAW OFFICES OF JOSEPH DANESHRAD**

---

**DECLARATION OF SIAMAK ETEHAD, M.D.**

1

## APPENDIX OF EVIDENCE

2

3   • Ford Deposition, pp. 11-12.............................................. Exhibit 1

4   • Valley Presbyterian Hosp. Radiological Report dated Sept. 28, 2000 ..... Exhibit 2

5   • Ford Deposition, pp. 19-20 ......................................... Exhibit 3

6   • Ford Deposition, pp. 17-18 ......................................... Exhibit 4

7   • Medical Board of Calif. License Lookup re Dr. Ordog .................... Exhibit 5

8   • Ford Deposition, pp. 164-165 ....................................... Exhibit 6

9   • Ford Deposition, pp. 117 ........................................... Exhibit 7

10  • Dr. Ordog's Letter dated Feb. 19, 2010 ............................. Exhibit 8

11

12

13

14  Dated:  June 30, 2011                    LAW OFFICES OF JOSEPH DANESHRAD

15

16

17

18                                  By:

19                                        Joseph Daneshrad, Esq.
                                          Attorneys for Plaintiff
20                                        Christopher Ford

21

22

23

24

25

26

27

28

LAW OFFICES OF JOSEPH DANESHRAD

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

EXHIBIT 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

CHRISTOPHER FORD,       )
                          )
       Plaintiff,    )
                          )
   vs.              )  Case No. 2:10-CV-04224-VBF-FFM
                          )
ENGELHARD HANOVIA, INC., )
and DOES 1 through 100,  )
Inclusive,             )
                          )
       Defendants.   )
_____)

DEPOSITION OF CHRISTOPHER BRIAN FORD

FEBRUARY 22, 2011



Reported By:  Susan M. Herington
               CSR No. 3088

File No.:  30222

4011 Birch Street • Suite 130
Newport Beach • California 92660
949-261-8686 • 800-622-0226

1        A.     Not yet, no.

2        Q.     Have you taken any medication today?

3        A.     No.

4        Q.     Have you taken any drug or medication in the

5    last 24 hours that would affect your ability to recall,

6    recollect or to proceed with the deposition?

7        A.     I don't think it would affect it.

8               The only thing I have taken was some

9    Hydrocodone.

10       Q.     Can you spell that for the record.

11       A.     I -- H-y-d-r-o-c-o-n-e.

12       Q.     And was that prescribed to you by a doctor?

13       A.     Yes.

14       Q.     Which doctor?

15       A.     That one would have been Dr. Shakespeare.

16       Q.     And do you know why Dr. Shakespeare prescribed

17   that medicine for you?

18       A.     For chronic pain.

19       Q.     And when did you take that medicine?

20       A.     I took it last night.

21       Q.     Do you remember what time?

22       A.     About 7:00 o'clock.

23       Q.     And how long have you been taking that

24   medicine?

25       A.     Oh, it would be at least 11, 12 years.

                              11

1      Q.    And what chronic pain were you experiencing or

2   are you experiencing that --

3      A.    It would be helpful for migraine headaches.  I

4   have kind of a --

5            See, my mind goes sometimes.  I have it on the

6   tip of my tongue and it will just leave.

7            Let me pause for a minute.  It's on the tip of

8   my --

9            Fibromyalgia.

10     Q.    Can you spell that for the record, if you can?

11     A.    My only best estimate would be p-h-y- --

12           No.  I can't.  I can't.

13     Q.    Okay.  If you need to take a break because you

14   feel a headache coming on, just let me know.

15           Like I said, if I have a question pending, try

16   to answer the question before you take a break.

17     A.    Yes.

18     Q.    But just to reiterate, do you feel that you

19   will have the ability to recall, recollect or proceed

20   with the deposition today?

21     A.    I think within reason.

22     Q.    What do you mean by within reason?

23     A.    Well, get mostly your questions answered.  I

24   can't guarantee my thoughts or my brain will respond or

25   remember every detail you might ask.

12

ABRAMS, MAH & KAHN

# EXHIBIT 2

Page 1 of 1

Patient Name   CHRISTOPHER B. FORD

Medical Record No.   269778

Procedure Date   09/28/2000

**COMPUTERIZED TOMOGRAPHY OF THE BRAIN:**

Computerized tomography of the brain was performed at 10 mm. intervals in the axial plane on the GE Helical CT scanner.

**FINDINGS:**        The ventricles are normal in size.   There is no shift in the midline structures.   No focal abnormal areas of increased or decreased absorption is noted.   There is some frontal cortical atrophy noted.

> IMPRESSION:

> MILD CORTICAL ATROPHY IN THE FRONTAL AREA.   OTHERWISE, NEGATIVE COMPUTERIZED TOMOGRAPHY OF THE BRAIN.


*Electronically viewed and signed on 9/29/2000 9:21:53 AM*

FFW/ls

_____

                                    FREDERICK F. WOLFE, MD

D:  9/28/00 12:47:00 PM
T:  09/28/2000 2:18:17 PM


cc:  . C.M.S.
     STEVEN L. ROUFF, MD

| | |
|---|---|
| **VALLEY PRESBYTERIAN HOSPITAL**<br>**15107 Vanowen St**<br>**Van Nuys, CA 91405**<br><br>**Radiology Record** | PATIENT:  FORD, CHRISTOPHER B<br>MR. NO. :  269778<br><br>ROOM NO. :     TYPE/LOC. :  O<br>PHYSICIAN:  STEVEN L ROUFF<br>DICTATED BY: FREDERICK F. WOLFE, MD |

Chart

# EXHIBIT 3

1   get your diploma.

2        Q.     How did you come to get the position with

3   Mr. Weiss?

4        A.     It was given me -- assigned to me by the

5   school.

6        Q.     Did you have to apply to Maric College?

7        A.     Yes.

8        Q.     Do you remember when you applied?

9        A.     Before December of '06.

10        Q.     And Maric College required you to have a high

11   school diploma?

12        A.     Later they did.

13        Q.     And that's when you --

14        A.     Already was into the program.

15        Q.     And then you received your high school diploma

16   in 2007 from Bellevue or Bellford High School?

17        A.     Right.

18        Q.     How did you find Bellevue or Bellford High

19   School?

20        A.     It was recommended by another student of mine

21   that was in the same situation.

22        Q.     Did you get a paper degree?

23        A.     Yes.

24        Q.     Was the degree a GED or was it actually a high

25   school diploma?

                              19

                    ABRAMS, MAH & KAHN

1      A.      It was actually a high school diploma.

2      Q.      And how long did it take for you to get the

3   high school diploma?

4      A.      Well, I accumulated a resume of what I've done

5   in the past and based upon the experience of having my

6   own business and running my own business and, you know,

7   doing my book work and mathematics and stuff, they felt

8   that I was qualified for a high school diploma.

9   Basically it was a resume.

10     Q.      Okay.  Have you gotten any other types of

11  degrees or certifications besides the ones that you've

12  already told me about?

13     A.      No.

14     Q.      Where do you currently reside?

15     A.      8830 Farralone Avenue.  That's

16  F-a-r-r-a-l-o-n-e.

17     Q.      What city?

18     A.      West Hills.

19     Q.      ZIP Code?

20     A.      91304.

21     Q.      And how long have you lived there?

22     A.      Since 1966.

23     Q.      Does anyone live there with you?

24     A.      Pardon me?

25     Q.      Does anyone live with you?

EXHIBIT 4

1    Q.    So it would have expired in March of 2010?

2    A.    Yes, I believe so.

3    Q.    Did you perform any work as a medical

4  assistant or an X-ray technician or a phlebotomist

5  between March 2008 and March 2010?

6    A.    No.

7    Q.    Did you look for any work?

8    A.    I tried, but I found out during my externship

9  that I -- I couldn't perform the tasks because of my

10  physical disabilities.

11    Q.    And you said that you did an externship?

12    A.    Yes.

13    Q.    Who was that with?

14    A.    Oh, that was a number of places.  I can't even

15  remember the names of them.

16    Q.    Do you remember the names of any of them?

17    A.    No.

18          I guess the one I remember the longest was --

19  was Sol Weiss, Dr. Sol Weiss, M.D.

20    Q.    Do you remember where Sol Weiss, M.D. is

21  located?

22    A.    He's on Sherman Way in Canoga Park, but the

23  address I don't know.

24    Q.    Do you remember how long you worked for Sol

25  Weiss, M.D.?

ABRAMS, MAH & KAHN

1    A.    I think it was three months.

2    Q.    And do you remember what functions you

3  performed?

4    A.    X-ray, phlebotomy and medical assisting.

5    Q.    How many days a week did you work for him?

6    A.    It was five days a week.

7    Q.    How many hours a day?

8    A.    I think it was about six.

9    Q.    Monday through Friday?

10   A.    Yes.

11   Q.    Why did you decide to get a degree in medical

12  assisting, X-ray technician and phlebotomy?

13   A.    Because I thought it was a work that I could

14  perform and I found out that I couldn't.

15   Q.    Had you had any prior experience in any of

16  those fields?

17   A.    No.  Not until I got the degree.

18   Q.    Do you remember any of the other people that

19  you externed for?

20   A.    No.  I don't recall them.  It was short-term

21  so I really don't remember.

22   Q.    Were you paid for the externship?

23   A.    No.

24   Q.    Did you get school credit for the externship?

25   A.    Yes.  You had to do it to complete the -- to

18

ABRAMS, MAH & KAHN

EXHIBIT 5



# MEDICAL BOARD OF CALIFORNIA
## LICENSE LOOKUP SYSTEM

## License Information:

The following information is maintained by the Medical Board of California. For more information, click on the blue tabs above.

| | |
|---|---|
| License: | **G 43038**<br>Licensee may be a U.S. or Canadian medical school graduate whose pathway to licensure was based on the NBME examination. |
| License Type: | Physician and Surgeon |
| Name: | GARY JOSEPH ORDOG, M.D. |
| Address of Record: | **PO BOX 220250**<br>**NEWHALL, CA 91322-0250** |
| Address of Record County: | LOS ANGELES |
| License Status: | **License Renewed & Current**<br>Licensee meets requirements for the practice of medicine in California. |
| Public Record Action(s): | **Limits On Practice**<br>Limitations have been placed on the physician's practice.<br>**Probation With Suspension**<br>Disciplinary decision rendered by the Board includes a period of probation and actual suspension as outlined in the decision. No practice is permitted while license is suspended. Probation has not been completed.<br>**Accusation Filed**<br>A formal, public charge by the Board alleging a physician violated the Medical Practice Act. This is the result of a fully investigated complaint that has been referred to the Attorney General's Office for prosecution. Practice is permitted unless otherwise specified. |
| Original Issue Date: | August 18, 1980 |
| Expiration Date: | June 30, 2012 |
| School Name: | UNIVERSITY OF BRITISH COLUMBIA FACULTY OF MEDICINE |
| Year Graduated: | 1979 |

## Physician Information:

The following information is **self-reported by the licensee and has not been verified by the Board.**

| | |
|---|---|
| Activities In Medicine: | PATIENT CARE - 40+ HOURS<br>RESEARCH - 20 TO 29 HOURS<br>TEACHING - 1 TO 9 HOURS<br>ADMINISTRATION - 1 TO 9 HOURS |
| Primary Practice Location Zip Code: | 91321 |
| Board Certification(s): | EMERGENCY MEDICINE<br>Visit ABMS to verify |
| Primary Practice Area(s): | EMERGENCY MEDICINE |
| Secondary Practice Area(s): | OTHER MEDICAL PRACTICE |
| Post Graduate Training Years: | 7 YEARS |
| Ethnic Background: | Declined to Disclose |
| Foreign Language(s): | FRENCH<br>SPANISH |
| Gender: | Male |

## Public Record Action(s):

Please select the Public Record Documents tab to view the public document database. If information is posted in the Administrative Disciplinary Actions, Court Order, Administrative Citation Issued, or License Issued with Public Letter of Reprimand categories below, documents may be available for review. To find out what information is and is not available, please click here.

### Administrative Disciplinary Actions:

The Medical Board's public disclosure screens are updated periodically as new information becomes available. Please contact the Central File Room at (916) 263-2525 or at 2005 Evergreen Street, Suite 1200, Sacramento, CA 95815, to obtain a copy of public documents at a minimal charge.

| | |
|---|---|
| Case Number: | D1-2001-124743 |
| Description of Action: | PETITION TO REVOKE PROBATION FILED. THE PHYSICIAN HAS NOT HAD A HEARING OR BEEN FOUND GUILTY OF ANY CHARGES. |
| Effective Date of Action: | March 1, 2011 |

| | |
|---|---|
| **Case Number:** | 05-2001-124743 |
| **Description of Action:** | SEVEN YEARS PROBATION WITH VARIOUS TERMS & CONDITIONS & NINETY DAYS ACTUAL SUSPENSION. SUSPENSION SERVED 06/11/06 TO 09/08/06. SHALL BE PROHIBITED FROM ENGAGING IN A MEDICAL-LEGAL OR FORENSICS PRACTICE OF MEDICINE DURING THE PERIOD OF PROBATION. |
| **Effective Date of Action:** | May 26, 2006 |

**Court Order:**
This information would be provided if a physician's practice has been temporarily restricted or suspended pursuant to a court order. Please contact the Central File Room at (916) 263-2525 or at 2005 Evergreen Street, Suite 1200, Sacramento, CA 95815, to obtain a copy of the public documents.
  **No Court Orders found.**

**Administrative Action Taken by Other State or Federal Government:**
This information is provided by another state/federal government agency. The Medical Board of California may take administrative action based on the action imposed by another state/federal government agency. For more information or verification, contact the agency listed below that imposed the action.
  **No Administrative Actions Taken by Other State or Federal Government found.**

**Felony Conviction:**
The information provided only includes felony convictions that are known to the Board. All felony convictions known to the Board are reviewed and administrative action is taken only if it is determined that a violation of the Medical Practice Act occurred. For more information regarding felony convictions, contact the court of jurisdiction listed below.
  **No Felony Convictions found.**

**Misdemeanor Conviction:**
California Business and Professions Code section 2027 (A)(7) states effective 1/1/07, any misdemeanor conviction that results in a disciplinary action or an accusation that is not subsequently withdrawn or dismissed shall be posted on the Internet. To see if a conviction has been expunged or dismissed, please contact the court below.
  **No Misdemeanor Convictions found.**

**Administrative Citation Issued:**
A citation and/or fine has been issued for a minor violation of the law. This is not considered disciplinary action under California law but is an administrative action. Payment of the fine amount represents satisfactory resolution of this matter.
  **No Administrative Citations found.**

**License Issued with Public Letter of Reprimand:**
The Medical Board of California has concurrently issued the applicant a medical license and a Public Letter of Reprimand for a minor violation that does not require probationary status or warrant denial. The issuance of a Public Letter of Reprimand is not considered disciplinary action and is not reported to the National Practitioner Databank or the Federation of State Medical Boards.
  **No License Issued with Public Letter of Reprimand found.**

**Hospital Disciplinary Action:**
The action taken by this healthcare facility against this physician's staff privileges to provide health care services at this facility was for a medical disciplinary cause or reason. The Medical Board is authorized by law to disclose only revocations and terminations of staff privileges. The Medical Board is prohibited from releasing a copy of the actual report or any other information.
  **No Hospital Disciplinary Actions found.**

**Malpractice Judgment:**
A malpractice judgment is a payment for damages and does not necessarily reflect that the physician's medical competence is below the standard of care. The Medical Board reviews all such reported judgments and action is taken only if it is determined that a violation of the Medical Practice Act occurred. The Medical Board is prohibited by law from releasing a copy of the judgment report or any other information concerning the judgment. For more information contact the court of jurisdiction listed below.
  **No Malpractice Judgments found.**

**Arbitration Award:**
An arbitration award is a payment for damages and does not necessarily reflect that the physician's medical competence is below the standard of care. The Medical Board reviews all such reported arbitration awards and action is taken only if it is determined that a violation of the Medical Practice Act occurred. The Medical Board is prohibited by law from releasing a copy of the arbitration award report or any other information concerning the award.
  **No Arbitration Awards found.**

**Malpractice Settlements:**
A settlement entered into by the licensee is a resolution of a claim for damages for death or personal injury caused by the licensee's negligence, error, or omission in practice, or by his or her rendering of unauthorized professional services. The Medical Board is required by law to disclose certain information related to the existence of multiple settlements made on or after January 1, 2003 in an amount of $30,000 or more.
  **No Malpractice Settlements found.**

**Note: "No information available from this agency" may not indicate none exists; but indicates no information has been reported to the Medical Board of California and/or that the Board is unable to post the information on the Web site by law.**

**Public Record Documents:**

All imaged documents provided by the Medical Board are being made available to provide immediate access for the convenience of interested persons. While the Medical Board believes the information to be reliable, human or mechanical error remains a possibility, as does delay in the posting or updating of information. Therefore, the Medical Board makes no guarantee as to the accuracy, completeness, timeliness, currency, or correct sequencing of the information. The Medical Board shall not be responsible for any errors or omissions, or for the use or results obtained from the use of this information. The types of documents which are available include, but are not limited to, accusations, decisions, suspension/restriction orders, public letters of reprimand and citations.

| Date | Type | Pages |
|---|---|---|
| March 1, 2011 | ACCUSATION/PETITION TO REVOKE | 6 |
| May 26, 2006 | DECISION | 59 |

**Please note that documents with an effective date prior to calendar year 2000 may not be available via the Web.** To obtain a copy of the documents not posted on this site, please contact the Central File Room at (916) 263-2525 or click here for information on ordering public documents.

**Disclaimer**
*All information provided by the Medical Board of California on this Web page, and on its other Web pages and Internet sites, is made available to provide immediate access for the convenience of interested persons. While the Board believes the information to be reliable, human or mechanical error remains a possibility, as does delay in the posting or updating of information. Therefore, the Board makes no guarantee as to the accuracy, completeness, timeliness, currency, or correct sequencing of the information. Neither the Board, nor any of the sources of the information, shall be responsible for any errors or omissions, or for the use or results obtained from the use of this information. Other specific cautionary notices may be included on other Web pages maintained by the Board. All access to and use of this Web page and any other Web page or Internet site of the Board is governed by the Disclaimers and Conditions for Access and Use as set forth at California Department of Consumer Affairs' Disclaimer Information and Use Information.*

# EXHIBIT 6

1       Q.      And it smelled like the same paint that you

2   used 30 years ago?

3       A.      Yes.

4       Q.      Is there any other reason why you believe it's

5   made of the same materials and ingredients as the paint

6   that you used 30 years ago?

7       A.      I believe -- I believe it is the same stuff.

8       Q.      Why do you believe that?

9       A.      Just from my own conclusions in that it was

10  made up of different metals.

11      Q.      Has anyone else told you that?

12      A.      Well, Alan told me and the toxicity report

13  says it was made out of different metals.

14      Q.      Okay.  Alan told you the paint was made out of

15  different metals you said?

16      A.      Yes.

17      Q.      You don't remember what metals he said?

18      A.      Just copper.

19      Q.      You don't remember any of the other metals?

20      A.      No.

21      Q.      And you said the toxicologist report showed

22  that the sample had different metals in it?

23      A.      Yes.

24      Q.      And you're referring to the toxicology report

25  from Pacific Toxicology Laboratories; correct?

ABRAMS, MAH & KAHN

1    A.    I think so.

2    Q.    Is there any other report?

3    A.    No.  Not that I know of.

4    Q.    So you have no evidence that the sample that

5  you purchased from New Mexico contains the same materials

6  as the paint that you used when you worked at Sci-Tech;

7  correct?

8        MR. DANESHRAD:  Are you talking about scientific

9  evidence like a laboratory report?

10       MS. HERNANDEZ:  I'm talking about any evidence.

11       THE WITNESS:  I don't have any knowledge of Hanovia

12  ever changing their formula.

13   Q.    BY MS. HERNANDEZ:  So --

14   A.    I'm just going by -- and I don't know if

15  that's -- that batch of paint was made the same year of

16  the stuff that I used or if it's been reformulated or

17  not.  I -- I don't work for Hanovia.  I have no idea.

18   Q.    So you have no evidence that the sample that

19  you bought has the same ingredients as the paint that you

20  used when you worked at Sci-Tech; correct?

21   A.    Correct.

22   Q.    And when did you buy the sample again?

23   A.    Two years ago, two to three.

24   Q.    So you told me you waited about a year from

25  the time that you remembered the conversation with Alan

165

EXHIBIT 7

1   2000.  Analysis of the Slick Co

2   Formula enclosed showed molybdenum 55 ppm,

3   boron, lime, phosphorus and calcium."

4   A. That was the Slick 50 that they used was made

5 in 2000 that had the molybdenum in it.

6    Prior to the year 2000, Slick 50 had a Teflon

7 base and not a molybdenum base.

8   Q. So at this time did you rule out the Slick Co

9 Formula as a possible cause of the heavy metal toxicity?

10   A. Yes.

11   Q. Okay.  No. 7 says, "The tips of

12   the torches for glass blowing have

13   copper tips which get very hot.  Exposure

14   to copper tips were in 1984 and around

15   2000."

16   A. Yes.

17   Q. So at this point you realized that copper was

18 one of the metals that can cause the metal heavy

19 toxicity?

20   A. Possibly.

21   Q. And did you rule out the tips of the torches

22 for the glass blowing as a possible cause of the heavy

23 metal toxicity?

24   A. Yes.

25   Q. So in 2003 you understood that copper was one

117

ABRAMS, MAH & KAHN

EXHIBIT 8

# GARY ORDOG, MD, FACEP, FABFE, FABFM, DABMT

## MEDICAL TOXICOLOGISTS
23504 Lyons Ave. Suite 101B, Santa Clarita, CA 91321
Mailing Address: PO Box 220250 Newhall, CA 91322-0250

### (661) 799-3453  Fax  (661) 799-3453

Date : February 19, 2010.

To Christopher Ford:

Hi Chris. Sorry that you couldn't read my notes on your lab tests. So, I am typing it for you.

What I was trying to tell you, is that Ali at the Pacific Toxicology Lab told me that the sheets that say urine tests, are actually the tests on the paint sample that you provided on the first date. This first test showed that molybdenum was significantly present in the paint.

The second test which was done by Ali at Pacific Toxicology, also showed the presence of significant molybdenum. (lab slip states: "pink, solution")

These are significant because it shows that you were exposed to molybdenum in the paint you worked with for several years, and even though the molybdenum level appears present in the paint, the way that you used it, it would have been vaporiuzed at high temperature, making it readily available for absorption. This is combined with your own labs and clinical evidence of heavy metal and molybdenum toxicity

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 11340 W. Olympic Blvd., Suite 275, Los Angeles, California 90064.

On **July 1, 2011**, I served the foregoing document described as **PLAINTIFF CHRISTOPHER FORD'S OPPOSITION TO DEFENDANT BASF CATALYSTS LLC'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF CHRISTOPHER FORD; DECLARATION OF SIAMAK ETEHAD, M.D.; EXHIBIT OF EVIDENCE IN SUPPORT THEREOF** on the interested parties in this action by placing ___ the original _X_ true copies thereof enclosed in a sealed envelope, addressed as follows:

> Ken Peterson, Esq.
> Jessica Hernandez, Esq.
> LITTLETON JOYCE UGHETTA PARK & KELLY, LLP
> 601 South Figueroa Street, Suite 3825
> Los Angeles, California 90017
> Fax: (213) 228-1980

_X_   **CM/ECF NOTICE OF ELECTRONIC FILING**: I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served via the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or other means permitted by the Court rules.

Executed on **July 1, 2011**, at Los Angeles, California.

_X_   FEDERAL: I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_Joseph Daneshrad_
Joseph Daneshrad

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

LAW OFFICES OF JOSEPH DANESHRAD